UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

FRANCISCO PEREZ,

    Plaintiff,

v.

DR. PRINCE, et al.,

    Defendants.

CIVIL ACTION NO. 1:22-cv-01087

(SAPORITO, J.)

## MEMORANDUM

Plaintiff Francisco Perez proceeds *pro se* on a complaint of inadequate medical care at SCI-Dallas for his shoulder injuries, which he alleges were exacerbated by the COVID-19 vaccine. Perez and defendant Dr. Scott Prince have moved for summary judgment. (Docs. 38, 45). Because Perez failed to exhaust administrative remedies as to most of his claims, any claim for injury from the vaccine is barred by the PREP Act, and the record would not have supported an Eighth Amendment violation, the Court grants summary judgment to Prince.

### I. BACKGROUND

Because his second amended complaint (Doc. 12) was dismissed in part, *see* (Docs. 21, 22), Perez proceeds on claims against two remaining defendants, Prince and Nurse "Jane Doe #2."

As relevant to these defendants, the operative complaint alleges as follows: On April 9, 2024, Nurse Doe administered the Johnson & Johnson COVID-19 vaccine to Perez two days after he received a cortisone shot. Perez told Doe about the cortisone shot, and Doe allegedly "assured/guaranteed" Perez that the vaccine "would not have any adverse effects or complications." After receiving the vaccine, Perez suffered pain and numbness, and "developed severe/catastrophic complications to where [he] lost mobility on the left side of his chest/arm/bicep and shoulder." Upon examination, an unnamed provider at SCI Dallas "could not identify the cause" of his symptoms. Perez requested to see an outside provider, but "SCI Dallas Medical Dep't/Sick Call personnel refused to consider the option."

In August 2024, Perez had an appointment with Dr. Prince, another provider at SCI-Dallas. Prince allegedly "agreed" that the vaccine "should have been delayed for a few weeks due to the prior cortisone shot." Perez repeated his request to see an outside provider, but Prince allegedly "ignore[d]" the request and "i[n]dicated that the State lacks funding." Perez "continued to encounter . . . unbearable pain/impairment/lack of mobility," which he attributes to side effects

from the vaccine. He also asserts that his "[n]eurological system and/or nervous system has been compromised."

The intended scope of Perez's claims is unclear, but he alleges that the defendants failed to properly investigate potential side effects of the vaccine; violated the Eighth Amendment by administering the Johnson and Johnson vaccine while it was "in the trial stage"; placed Perez "in a treatment plan contrary to the cause of the injury"; and generally failed to "follow protocol/policy/procedure/laws of the Commonwealth [and] Federal laws."[1]

Prince and Perez have moved for summary judgment. (Docs. 38, 45). Also before the Court are four discovery motions filed by Perez (Docs. 36, 44[2], 46, 53); Perez's motion for an award of attorney fees as a "prevailing party" (Doc. 47); and Perez's renewed request for

---

[1] The Court does not construe Perez to assert a state law claim of medical negligence, and any such claim would be subject to dismissal for failure to timely file a Certificate of Merit. *See* Pa. R. Civ. P. 1042.3.

[2] Perez's June 21, 2024, motion is titled "Motion for Summary Judgment," but he also refers to it as a "Motion for Default Judgment." *See* (Doc. 44). In substance, the motion requests "full disclosure of discovery from January 1st 2024 to June 24th 2024," including certain medical records from that period. Accordingly, the Court construes this filing as a motion to compel production of documents.

appointment of counsel (Doc. 52).

## II. LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that

"the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

### III.  MATERIAL FACTS

Based on the evidence presented with the parties' motions for summary judgment, the following facts are undisputed.[3]

---

[3] Perez did not respond directly to Prince's statement of material facts, or submit his own statement of facts, but attached evidence to his response brief and in support of his own motion. *See* Fed. R. Civ. P. 56(c)(3) (in addition to properly cited materials, the court "may consider
*(continued on next page)*

## A. Pre-existing Shoulder Issues

In March 2021, before receiving his COVID vaccine, Perez repeatedly complained to prison medical staff of pain in his neck and left shoulder, which he had been suffering for at least a year. An X-ray revealed "no radiographic evidence of an acute fracture or acromioclavicular separation," but showed "soft tissue calcifications adjacent to the humeral tuberosity suspicious for changes associated with calcific tendinopathy[4]."

On March 16, after a sick call with PA Devon Woolfolk, Perez was scheduled for a doctor's appointment "to discuss injection vs. PT," and "agree[d]" with this plan. However, the following day, Perez requested to

---

other materials in the record"). However, Perez's factual allegations in the motions and briefs themselves, unless linked to evidence in the record, are not competent evidence at the summary judgment stage. *See* (Docs. 45, 54); Fed. R. Civ. P. 56(c)(1). Where Perez has not presented competent evidence to demonstrate a genuine dispute of material fact, Prince's fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1.

[4] In general, calcific tendonitis refers to inflammation caused by calcium buildup within the tendons, potentially causing pain and reduced range of motion. "Calcific tendinopathy" refers specifically to tendon pain. *See Calcific Tendonitis: Symptoms, Causes, and Treatment*, https://my.clevelandclinic.org/health/diseases/21638-calcific-tendonitis (last accessed June 18, 2025).

have surgery on his shoulder, rather than injections or physical therapy. He was told that he must have one or the other before surgery would be considered. He received prescriptions of Motrin and prednisone on a trial basis. On March 30, Perez reported that his symptoms were not improving. Woolfolk prescribed Naprosyn and requested a physical therapy consultation.

On April 7, for the first time documented in the record, Perez saw defendant Dr. Prince. Perez reported that his pain and numbness was "getting worse." Prince prescribed a Kenalog[5] injection and physical therapy, with a follow-up in one month.

### B. COVID-19 Vaccine and Aftermath

On April 9, Perez received the Johnson & Johnson COVID-19 vaccine, which was administered in his right (non-injured) arm by nurse Taylor Mack. The records of the vaccination do not indicate that Prince was involved in any way.

On May 5, Perez reported no improvement from the Kenalog or

---

[5] Kenalog, a trade name for the drug known as triamcinolone, is a corticosteroid that can reduce inflammation. *See Triamcinolone*, https://www.mayoclinic.org/drugs-supplements/triamcinolone-injection-route/description/drg-20074674 (last visited June 18, 2025). The Court infers that this is the "cortisone" injection Perez refers to in his filings.

physical therapy. Prince prescribed another injection and continued physical therapy exercises, with a follow-up in two months. On July 9, Perez reported that his May injection had helped for several weeks but had begun to wear off. He received another Kenalog injection, and a follow-up was scheduled for September.

On July 23, Perez was seen at a sick call by PA Woolfolk. Perez reported "left arm weakness and muscle atrophy for 2 months [a]ssociated with mild numbness to his left arm and left leg," which he attributed to the COVID vaccine. He stated that he was "noticing the muscle mass in his left arm get progressively worse." An examination revealed decreased grip strength in his left arm and "significant muscle atrophy [in his] left triceps region compared to his right." After consultation with Prince, Woolfolk prescribed Prednisone and more physical therapy. The notes indicate that Perez "agree[d] with" this plan.

### C. Follow-up Treatment

Over the next two years, Perez had more than 20 encounters with various medical personnel to address his left arm or shoulder. *See* (Doc. 38-1 at 6-20). The Court summarizes these visits to the extent relevant to his deliberate indifference claims against Dr. Prince.

On August 5, 2021, Perez attended another sick call with Woolfolk, reporting no improvement the last visit. An EKG showed unremarkable results, and Woolfolk ordered a carotid ultrasound, which showed no significant stenosis. The next visit with Prince was September 10, where Prince noted "some atrophy of muscles in the left chest and left upper arm." His assessment was "disuse atrophy," and he advised Perez to continue doing physical therapy exercises.

On December 23, after a series of sick calls with other providers, Perez saw Prince again. Perez reported numbness, tingling, and scapular pain. Prince prescribed Pamelor and scheduled Perez for a three-month follow-up. On April 1, 2022, at the follow-up, Perez reported that the Pamelor made his symptoms worse. He continued to have numbness and tingling. Prince assessed pectoral atrophy and neuropathy, and prescribed Trileptal. On July 25, 2022, Perez again complained that his muscle atrophy was worsening. He claimed that Trileptal gave him nosebleeds, and Prince prescribed a three-month trial of Cymbalta.

On November 2, 2022, Perez reported some improvement with pain, but numbness and tingling persisted. Prince advised him to "continue Cymbalta, it seems to be starting to help." However, on February 2, 2023,

Perez complained to Prince that Cymbalta made him sleepy, and his neuropathy was no better. Prince changed Perez's Cymbalta to evening distribution and advised to continue his physical therapy exercises. At this point, given the neuropathy diagnosis, Prince "discussed with Perez that this will probably never improve, especially the atrophy and decrease in strength." On May 8, 2023, the last interaction with Prince documented in the records, Perez reported that "[t]he symptoms are better, but still happen." There was less pain and numbness, but muscle weakness and atrophy persisted. Prince's treatment plan was unchanged.

### D. Prison Grievances

The Pennsylvania Department of Corrections ("DOC") provides a three-part procedure for inmate grievances: initial review by a Grievance Officer, appeal to the Facility Manager, and final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). *See* (Doc. 38-5).

Perez pursued two grievances relevant to this action. On July 24, 2021, Perez lodged Grievance No. 937929, alleging that the COVID-19 vaccine had caused him to "start experiencing side effects such as in my left arm and left side of my chest." As relief, he sought to be "compensated

for . . . injuries suffer[ed] by the COVID 19 J&J shot." On appeal, he further explained: "I[']m not a [doctor] but I believe . . . the cortisone in my body mix[ed] with the Johnson and Johnson COVID vaccine," causing the left arm and chest to "collapse." The grievance was denied at all levels of review.

On May 16, 2022, Perez filed Grievance No. 980999. Therein, he alleged that he was receiving too many different medications, which were ineffective and causing side effects; that the prison doctors could not diagnose him or were "trying to hide something"; and that his request to see an "MRI specialist" had been refused "with no logical explanation." This grievance was denied, with the grievance officer explaining that "neuropathy isn't curable[,] it's only treatable," and that there was no indicated medical need for an MRI, but Perez could sign up for further sick calls to discuss treatment. Although Perez argues that he satisfied "all 3 stages of the grievance process" for all grievances, the record indicates that Perez did not appeal to SOIGA, the last step in the grievance process.

## IV. DISCUSSION

### A. Dismissal of Jane Doe #2

Perez proceeds against Prince and "Jane Doe #2," a nurse allegedly involved in administering his COVID vaccine. Because discovery has closed, and Jane Doe #2 has not been identified[6], that defendant will be dismissed. *See Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250 (3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities . . . the John Doe defendants must be dismissed."); *Cole v. RHU Officers John Doe*, No. CIV. 1:04-CV-1218, 2005 WL 2648342, at *4 (M.D. Pa. Oct. 17, 2005).

### B. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), prisoners complaining about the conditions of their confinement must exhaust available administrative remedies before they may file suit in federal court. 42 U.S.C. § 1997e(a). The PLRA requires proper exhaustion, meaning plaintiffs must administratively grieve their claims in accordance with the procedural rules of the prison in which they are

---

[6] Perez filed an amended complaint after the close of discovery, but it was stricken because he filed it without seeking leave to amend. Nonetheless, it named Prince as the sole defendant, suggesting that Perez has abandoned any claim against Jane Doe #2. *See* (Docs. 57, 61).

incarcerated. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Therefore, exhaustion within the Department of Corrections requires appeal to SOIGA, the third and final step of the process. *See Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004). To exhaust remedies on a particular issue, the grievance in question must "alert prison officials to [the] problem," but need not "provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)).

Perez's only exhausted grievance, No. 937929, sought compensation for injuries allegedly caused by medical staff administering the COVID vaccine two days after his cortisone shot. Perez did not, at that time, contend that he was being improperly treated for the injuries themselves[7], so his grievance would not have "alert[ed] prison officials to a problem" with Prince's treatment of his shoulder *after* the vaccine. The

---

[7] Perez's grievance noted that the "sick call doctor . . . couldn't identify the cause" of his injuries. The context indicates that Perez was not alleging improper treatment by Woolfolk based on the failure to diagnose, but that Perez believed the unknown etiology showed that the COVID vaccine was to blame.

later grievance in which Perez claimed inadequate treatment was not appealed to SOIGA.[8] Even though the two grievances were "generally related to the same subject matter," they addressed discrete issues, and exhaustion of the initial grievance does not preserve new claims filed in the later, unexhausted grievance. *See, e.g., Alexis v. Connors*, No. 23-2502, 2024 WL 3534480, at *4 (3d Cir. July 25, 2024). Therefore, any claim against Prince would have to be premised on his involvement in the allegedly improper administration of the COVID vaccine.

## C. PREP Act

The Public Readiness and Emergency Preparedness Act ("PREP Act") makes Prince immune from Perez's sole exhausted claim related to the COVID-19 vaccine. The PREP Act protects a "covered person" from "liability under Federal and State law with respect to all claims for loss

---

[8] Perez generally alleges that he exhausted all available remedies, but he presents no evidence that he appealed Grievance No. 980999 to SOIGA. *See* (Doc. 54 at 5-6, Doc. 54-2) (Perez's exhibits allegedly "show[ing] that, at all 3 stages of the grievance process, Perez did file them"; the alleged appeal of Grievance No. 980999 to SOIGA is not included). Perez also claims that the DOC generally "failed to respond to grievances in a timely manner." However, the record does not show any improper delay as to this grievance: the responses to the grievance and the initial appeal were each dated within 15 working days of receipt, as required by DOC policy. *See* (Docs. 38-4, 38-5).

caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure" to address a public health emergency. *See* 42 U.S.C. §§ 247d-6d(a)(1),(b)(1). Covered persons include those who "prescribed, administered, or dispensed" the countermeasure and were licensed to do so. *Id.*, §§ 247d-6d(i)(2)(B),(i)(8).

On March 17, 2020, the Secretary of Health and Human Services declared the spread of COVID-19 a public health emergency. *See* Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020). That declaration defined "covered countermeasures" to include "any antiviral, any other drug, any biologic, any diagnostic, any other device, *or any vaccine*, used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom." *See id.* at 15202 (emphasis added). Therefore, the Act preempts claims[9] against health care providers who administered the

---

[9] The PREP Act contains an exception in the form of an exclusive claim for "death or serious physical injury proximately caused by willful misconduct." *See* 42 U.S.C. § 247d-6d(d)(1). However, a willful misconduct claim under the PREP Act must be brought in the District of Columbia; the Act forecloses "any other civil action" raising such a claim. *See* §§ 247d-6d(e)(1), 247d-6e(d)(1); *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 409 (3d Cir. 2021).

COVID-19 vaccine, such as those who were negligent in "prescribing the wrong dose." *See id.* at 15200.

As noted, Perez's only exhausted claim is his request for compensation for injuries caused by the vaccine. To the extent that claim would be viable against Prince, it would be based on a contention that Prince "prescribed, administered, or dispensed" the COVID vaccine, but Prince is immune from any such claim under the PREP Act. The record indicates that Perez's vaccine was administered by a nurse, but even assuming Prince was somehow involved, he is immune from Eighth Amendment liability. *See* 85 Fed. Reg. at 15200 ("[a]dministration" of covered countermeasures includes "activities and decisions directly relating to . . . dispensing of the countermeasures to recipients"). Therefore, the PREP Act, combined with Perez's failure to exhaust administrative remedies, compels summary judgment for Prince.[10]

---

[10] Regardless, the record in this case would not have sustained an Eighth Amendment claim. While Perez is convinced that the vaccine caused his shoulder injuries, the record indicates that his shoulder issues predated the vaccine and were intensifying before he received the vaccine; the vaccine was administered in his non-injured arm, which was unaffected; and his symptoms actually improved in the months immediately following the vaccine. Further, even if Perez's claims of inadequate treatment had been properly exhausted, his disagreement
*(continued on next page)*

## V. CONCLUSION

For the reasons described above, Jane Doe #2 will be dismissed, summary judgment will be granted to Prince, and Perez's remaining motions will be denied as moot. An appropriate order follows.

Dated: June 20, 2025           *s/Joseph F. Saporito, Jr.*
                               JOSEPH F. SAPORITO, JR.
                               United States District Judge

---

with Prince's diagnosis and treatment would not show an Eighth Amendment violation, nor is he constitutionally entitled to a second opinion from an outside provider. *See Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976); *Arroyo v. Primecare Med. Inc.*, No. 3:15-CV-2039, 2016 WL 3457723, at *3 (M.D. Pa. June 23, 2016).